STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

PAMELA WASHINGTON,

                Plaintiff,

v.

THE CHARLOTTE-MECKLENBURG
HOSPITAL AUTHORITY d/b/a ATRIUM
HEALTH f/k/a CAROLINAS HEALTHCARE
SYSTEM,

                Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR Court DIVISION
19-CVS-558

FILED

2019 JAN 28 P 4:49

MECKLENBURG CO., C.S.C.

BY_____

**COMPLAINT**
**(Jury Trial Demanded)**

COMES NOW Plaintiff Pamela Washington complaining of Defendant The Charlotte-Mecklenburg Hospital Authority d/b/a Atrium Health f/k/a Carolinas HealthCare System and alleges as follows:

**PARTIES**

1.     Plaintiff Pamela Washington ("Plaintiff" or "Washington") is an adult citizen and resident of Charlotte, Mecklenburg County, North Carolina.

2.     Upon information and belief, Defendant The Charlotte-Mecklenburg Hospital Authority d/b/a Atrium Health f/k/a Carolinas HealthCare System ("Defendant" or "Atrium") is a nonprofit corporation, organized under the laws of the State of North Carolina, with its principal office and place of business located at 1000 Blythe Boulevard, Charlotte, North Carolina, 28203.

3.     At all relevant times, Defendant was an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b); ADAAA, 42 U.S.C. § 12111(5); and all other applicable state and federal laws alleged herein.

**Exhibit A**

1

4.      At all relevant times, Plaintiff was an "employee" as defined by Title VII, 42 U.S.C. § 2000e(f); ADAAA, 42 U.S.C. § 12111(4); and all other applicable state and federal laws alleged herein.

5.      At all relevant times, Defendant employed 500 or more employees.

## JURISDICTION AND VENUE

6.      This Court has personal jurisdiction under N.C. Gen. Stat. § 1-75.4 as the Defendant, upon information and belief, has been and is engaged in substantial activity within Mecklenburg County, North Carolina.

7.      This Court has subject matter jurisdiction in that the damages to Plaintiff as a result of the acts or omissions of Defendant causing damages to Plaintiff occurred in North Carolina. The amount in controversy is in excess of $25,000.

8.      Venue is proper in this Court under N.C. Gen. Stat. § 1-79 as, upon information and belief, Defendant conducted and continues to conduct business in Mecklenburg County, North Carolina.

## ADMINISTRATIVE PROCEDURES

9.      Plaintiff timely submitted her first Charge of Discrimination against Defendant with the Equal Employment Opportunity Commission ("First EEOC Charge") on July 19, 2016, alleging discrimination and retaliation based on Plaintiff's sex and race in violation of Title VII of the Civil Rights Act of 1964, as amended, ("Title VII"); and discrimination and retaliation based on Plaintiff's disability in violation of Title I of the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA").

10.      After Plaintiff filed the First EEOC Charge, Defendant removed Plaintiff from her position and refused to engage in a meaningful interactive process to determine reasonable

2

accommodations. Defendant retaliated against Plaintiff for engaging in protected activity, and Plaintiff therefore filed a second charge with the EEOC on December 5, 2016, alleging retaliation and discrimination based on race, sex, and disability in violation of Title VII and the ADAAA ("Second EEOC Charge").

11.     Defendant issued Plaintiff a final written counseling shortly after the Second EEOC Charge was filed, and then terminated Plaintiff's employment without notifying her. Defendant again discriminated and retaliated against Plaintiff based on her race, sex, and disability and for engaging in protected activity, and Plaintiff filed her third charge with the EEOC on July 7, 2017 ("Third EEOC Charge") and filed an Amended Charge on October 18, 2017.

12.     On or about October 15, 2018, Plaintiff received Notices of Right to Sue from the EEOC entitling her to commence this action within (90) days of her receipt of the notices for the Second and Third EEOC Charges.

13.     On January 7, 2019, Plaintiff filed, and the Clerk issued a Civil Summons to be Served with Order Extending Time to File Complaint. Plaintiff also filed an Application and Order Extending Time to File Complaint the same day, which was granted and extended her time to file the Complaint by twenty (20) days pursuant to Rule 3 of the North Carolina Rules of Civil Procedure.

14.     Plaintiff now timely files this Complaint.

15.     Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

3

## BACKGROUND

*Atrium/CHS*

16.     Defendant is Charlotte's largest healthcare provider and employer. It also operates hospitals and healthcare facilities across North Carolina, South Carolina, and Georgia, with approximately 65,000 total employees.

17.     Prior to a rebranding process completed in 2018, Defendant was known as Carolina HealthCare Systems ("CHS")

18.     Upon information and belief, Defendant engages in a policy, pattern, and practice of denying reassignment as an accommodation to employees who, because of a disability, can no longer perform the essential functions of their current position, with or without reasonable accommodation. Instead, the employee has ninety (90) days on their own to find a job.

19.     Upon information and belief, Defendant engages in a policy, pattern, and practice of terminating employees with disabilities after 90 days if they are not able to obtain another position by applying and competing for vacant positions for which they are qualified in violation of the ADAAA.

20.     Upon information and belief, Defendant also has a pattern and practice of failing to accommodate employees with disabilities who can perform the essential functions of their current position with reasonable accommodation. Instead, upon further information and belief, Defendant removes the employees from their current position and gives them an ultimatum of either (1) placing them on unpaid leave until they can return to work and perform their job without any accommodation, or (2) giving them 90 days to apply and compete for another job with the hopes of being hired to a position they can work without accommodation. Upon information and belief, if the employee does not find a job within 90 days, they are terminated.

4

21.     Upon information and belief, by having a pattern and practice of placing persons requesting accommodation on unpaid leave instead of accommodating them in their current position, Defendant essentially tries to force those employees to quit.

22.     Upon information and belief, Defendant has a policy, pattern, and practice of requiring employees to be "100%" able to work without any accommodations, and of forcing employees who request accommodations out of the workplace to negatively impact them so they will quit.

23.     Upon information and belief, Defendant has a pattern and practice of failing to engage in the interactive process in violation of the ADAAA.

24.     Upon information and belief, Defendant has a pattern and practice of claiming the requested accommodations pose an undue hardship when they do not and will not provide the employee with the reasoning behind the decision or provide any alternatives that would allow the employee to remain in their position.

25.     The purpose of the ADAAA is to allow reasonable accommodations so employees can perform the essential functions of their current positions and remain employed.

26.     Defendant has a Return to Work with Medical Restrictions (HR-4.10) ("CHS HR-4.10") policy which states:

> A team member may be unable to return to their regular job at the end of the 90 day temporary transitional assignment benefit. In this instance, the team member's situation will be reviewed. During this review, the team member may be placed on leave of absence. The need may exist for the team member to enter into a job with permanent modifications. Approved team members will be assigned by a Transition Services coordinator in finding a position. At this time, the possible need for Americans with Disabilities act of 1990 (ADA) accommodations will be considered. (Policy 4.02, *Disabilities: Team Members & Persons Applying for Jobs*).
>
> If a position is not found within 90 days after working with the Transition Services coordinator and whether or not a temporary assignment is found, unfortunately the

5

employment relationship with CHS will end unless accommodations (sic) necessary to comply with the ADA.

27.     Upon information and belief, Defendant has a pattern and practice of interpreting and applying the language of CHS HR-4.10 to employees with disabilities who request accommodations as follows in a manner that excludes the phrases "At this time, the possible need for Americans with Disabilities act of 1990 (ADA) accommodations will be considered" and "unless accommodations (sic) necessary to comply with the ADA.":

A team member may be unable to return to their regular job at the end of the 90 day temporary transitional assignment benefit. In this instance, the team member's situation will be reviewed...Approved team members will be assisted by a Transition Services coordinator in finding a position... If a position is not found within 90 calendar days after working with the Transition Services coordinator and whether or not a temporary assignment is found, unfortunately the employment relationship with CHS will end.

28.     Upon information and belief, Defendant changes the term, "may be placed on a leave of absence," to "will be placed on a leave of absence" when they decide to retaliate or discriminate against an employee.

29.     Upon information and belief, Defendant claims HR 4.10 is a legitimate, non-discriminatory reason to terminate an employee with disabilities. Upon information and belief, Defendant has a pattern and practice of using this policy as pretext to terminate employees with disabilities.

*Plaintiff*

30.     Plaintiff is a Black/African American female with disabilities and is thus a member of protected classes.

31.     Plaintiff worked in healthcare for over 22 years.

32.     Plaintiff started working for Defendant in April 2006 as a Clinical Nurse I in Defendant's Radiology Department at Mercy Hospital ("Mercy Radiology"). Plaintiff was a

6

Certified Radiology Nurse ("CRN") from 2012 to October 2016. The CRN credential is not required for the position.

33.     At the time of Plaintiff's employment, Mercy Radiology had four nurses per shift to provide coverage in interventional radiology ("IR"); computed tomography ("CT"); Diagnostic; Ultrasound; Nuclear Medicine; and Magnetic Resonance Imaging ("MRI").

34.     Mercy Radiology was also staffed with a technologist, technologist aides, and two in-house, on-duty physicians.

35.     The Clinical Nurse I position requires that the employee be able to walk, stand, sit, reach, stoop, bend, push, pull, and lift thirty-five (35) pounds, but a Clinical Nurse in Radiology does not and is not required to constantly walk or stand non-stop throughout an entire shift.

36.     The nurses can sit throughout their shift. For example, while in IR, the nurse can sit or stand while monitoring a patient's blood flow and pressure; any nurse can sit or stand while getting a patient ready for a procedure; the nurse assigned to post-op will sit for most of the entire shift unless responding to call bells or going over discharge paperwork; in CT cases requiring moderate sedation, the nurse can sit or stand to complete the process.

37.     A Clinical Nurse at Mercy Radiology is *not* required to stand for the entire shift.

38.     A Clinical Nurse at Mercy Radiology *is* permitted to sit for extended periods.

*New Supervisor*

39.     In or around September 2014, Michael Cudd ("Mr. Cudd") (white male) became Plaintiff's supervisor.

40.     In 2014, Plaintiff had a wage and hour dispute with Defendant which was resolved in or around October 2014. Upon information and belief, Mr. Cudd and other decisionmakers and Human Resources personnel had knowledge of Plaintiff's wage complaint and resolution.

7

41.     Shortly after Plaintiff's wage and hour complaint and resolution, Mr. Cudd began retaliating against Plaintiff when she requested an accommodation in the form of a modified work schedule in January 2015 after a partial hospitalization due to her disability. Plaintiff needed a modified schedule to attend doctor's appointments during a period of severe depression triggered by an incident involving domestic violence and was diagnosed with major depressive disorder, anxiety, and ADHD, which substantially limited major life activities, including but not limited to: sleeping, concentrating, focusing, organizing or completing paperwork, interacting with others, and fatigue.

42.     Mr. Cudd mockingly and repeatedly referred to Plaintiff's January 2015 reasonable accommodation request as her "little magic."

43.     Mr. Cudd refused the accommodation, treated her more harshly than her white, non-disabled coworkers, and changed her schedule from an 8:00am to 7:30am start time, although Plaintiff told him the earliest time she could drop her son off at school was 7:30am. Upon information and belief, Mr. Cudd was aware that Plaintiff's son has autism.

44.     Mr. Cudd was also aware that the earliest time Plaintiff could drop her son off at school was 7:30am and knew this schedule change would cause Plaintiff to be late for work. When Plaintiff was late, Mr. Cudd threatened to give her a written warning. Plaintiff pointed out that if he gave her a written warning for tardiness, then he should warn the other tardy staff as well.

45.     Plaintiff's white, non-disabled coworkers were treated more favorably while Mr. Cudd placed Plaintiff under increased scrutiny. Upon information and belief, Plaintiff's two white, non-disabled male and female coworkers were frequently tardy, but were not reprimanded.

46.     In response to Plaintiff stating the staff should be treated equally, Mr. Cudd ripped up the written warning.  Upon information and belief, Mr. Cudd and Defendant then sought other ways to retaliate and discriminate against Plaintiff.

*Medical Leave of Absence and Requested Accommodations*

47.     In March 2016, Plaintiff requested and received a medical leave of absence to undergo reconstructive surgery on her foot and ankle to reconstruct them after a severe injury.

48.     While the surgery was successful, complications occurred during the healing process, Plaintiff was diagnosed with chronic pain syndrome with ongoing soft tissue disorders, itself a disability.

49.     In early May 2016, Plaintiff's doctor determined that Plaintiff had sufficiently recovered to return to work on May 18, 2016, but she was temporarily limited to sit down work as she continued her recovery.

50.     Plaintiff submitted the requested accommodation and her doctor's note to Defendant.  In response to Plaintiff's requested accommodation, Defendant told her that she could not return to Mercy Radiology until she was 100% recovered, and then placed her on temporary assignment at the Pediatric Resource Center.

51.     The Pediatric Resource Center provides assistance to children, including children who have been sexually abused.

52.     The Pediatric Resource Center assignment was difficult for Plaintiff given her recent experience with domestic violence and made it difficult for her to manage her depression. This type of work triggered a relapse of Plaintiff's depression.

53.     In or around June 2016, Plaintiff called Mr. Cudd and explained she was having a difficult time at the Pediatric Resource Center, informed him of her upcoming doctor's appointment, and requested to return to Radiology.

9

54.     On June 16, 2016, her only restriction/request for accommodation was no standing or walking for more than 30 minutes per hour. Mr. Cudd denied her request. Defendant would not allow her to return to Radiology until she was 100%.

55.     Plaintiff worked in the Pediatric Resource Center from approximately May 28 to June 27, 2016.

56.     Plaintiff's psychiatrist requested that Plaintiff be permitted to return to Mercy Radiology or be reassigned to a vacant position since she needed a position not focused primarily on victims of domestic violence or sexual abuse. On or about June 29, 2016, Plaintiff submitted a Request for Reasonable Accommodation for a 5-day leave of absence, to return to Mercy Radiology, or, if they would not return her to Mercy Radiology, reassignment to a vacant position.

57.     While Defendant granted Plaintiff's request to leave the Pediatric Resource Center, she was required to take unpaid leave for nearly a month before the transfer to a new department could be completed at the end of July 2016. Again, upon information and belief, Defendant was trying to make Plaintiff quit by forcing her to take extended unpaid leave when she was willing and able to work.

58.     On July 28, 2016, as Plaintiff continued to recover from her surgery, she provided Defendant with a renewed and updated request for accommodation to allow her to return to Mercy Radiology. Her request included three reasonable accommodations: use of a knee scooter while working, flexibility to attend physical therapy appointments, and ability to rest for 2-4 minutes as needed. Defendant denied her request to return to Mercy Radiology maintaining that she had to be at 100% without needing accommodations before she could return. Defendant denied the accommodations and claimed without explanation that they posed an undue hardship.

59.     On July 31, 2016, Plaintiff's temporary transfer to Teen Health Connection was completed and Plaintiff spent nearly a month in this department. Teen Health Connection is a healthcare practice that provides medical and mental healthcare and prevention and health education services for adolescents aged 11 to 22. Upon information and belief, the requested accommodations did not pose an undue hardship. She learned the job and did it well.

60.     Plaintiff was praised for doing great work at Teen Health Connection. They needed her and she loved the work.

61.     At the end of August 2016, Defendant informed Plaintiff her temporary assignment expired, and she would not be allowed to remain in TEEN Health Connection. Upon information and belief, Teen Health Connection still needed Plaintiff's assistance, but Defendant refused to allow her to remain.

62.     Upon information and belief, Defendant filled the role at Teen Health Connection with someone outside of Plaintiff's protected classes.

63.     On September 15, 2016, Plaintiff's doctor provided a letter stating Plaintiff could return to work and perform the essential functions of her job with Mercy Radiology with the following reasonable accommodations: (1) permitted to sit for 15 minutes intermittently; (2) infrequent use of a knee scooter when swelling and discomfort demanded; and (3) avoid excessive stair and ladder climbing. The note said there was no specific lifting restriction and that Plaintiff was able to lift 35 pounds as required of a clinical nurse. Defendant again denied Plaintiff's request to move back to Mercy Radiology. The alternative requested accommodation was reassignment to a vacant position.

11

64.     Defendant claimed that providing Plaintiff the requested accommodation would cause Defendant undue hardship but provided no explanation for how the accommodation would be an undue hardship.

65.     Upon information and belief, the accommodation did not cause undue hardship.

66.     Defendant provided Plaintiff with two options: (1) unpaid leave of absence until October 31, 2016 or (2) accept reassignment to Transition Services for 90 days.

67.     Upon information and belief, Defendant's two limited options represent a policy, pattern, and practice of failing to engage in the interactive process with employees requesting reasonable accommodations for disabilities, and upon information and belief, were also in violation of the ADAAA.

68.     Defendant's policy, pattern, and practice is discriminatory, retaliatory, and designed to create pretext to terminate employees requesting reasonable accommodations for disabilities after an arbitrary period of ninety (90) days.

69.     Employees placed in Transition Services are required to submit their applications, follow-up with their assigned counselor, and bear the responsibility of finding a job at any of Defendant's facilities within 90 days. If they do not find a job within 90 days, Defendant terminates their employment.

70.     By the practices Defendant follows, Defendant has created policies and practices that enable it to terminate rather than accommodate persons with disabilities.

71.     On October 21, 2016, Plaintiff's doctor again provided an evaluation to Defendant of Plaintiff's condition. He stated that Plaintiff could return to work without restrictions, only requiring occasional, fifteen minutes of sitting as necessary for increased pain and swelling.

12

72.     Defendant denied Plaintiff's requested accommodation and claimed the doctor's note was contradictory. Defendant required Plaintiff to choose between going on unpaid leave or leaving her position at Mercy Radiology and competing for a position through Transition Services. Again, Defendant's response demonstrated an arbitrary policy or practice unresponsive to her request for reasonable accommodation.

73.     On or about November 10, 2016, Plaintiff's doctor provided additional clarification to assist her return to Mercy Radiology after Defendant unreasonably requested clarification. The doctor described Plaintiff's condition, stating that she would not need more than fifteen minutes per hour of seated work if necessary, and that would only occur at intervals. Plaintiff's doctor further stated she could perform her job without further modifications and that he expected her condition to gradually improve over time. It was explained to Defendant that this did not mean that Plaintiff would be required to sit for blocks of 15 minutes, nor did it mean she would need to sit for 15 minutes of every hour.

74.     Not only is Plaintiff's doctor familiar with the requirements of Plaintiff's position because of his own medical practice, but he is also a leading expert in the area of orthopedic care.

75.     Defendant again denied Plaintiff's requested accommodation and asserted that her condition had not improved since September 2016.

76.     Plaintiff went from requiring 15 minutes of seated work per hour to only needing 15 minutes of seated work as necessary for increased pain and swelling.

77.     Defendant refused to provide Plaintiff with explanations for why it would be unable to accommodate her request, preventing her from understanding what was required for her to return to Mercy Radiology.

78.     Defendant refused to consider any alternatives to its two proposed options.

79.     Defendant's claimed need for clarification from Plaintiff's doctor regarding Plaintiff's condition was also unnecessary as Plaintiff's doctor had provided sufficient detail to Defendant to permit Plaintiff's return to Mercy Radiology.

80.     On Nov. 15, 2016, Defendant informed Plaintiff that it would no longer hold her position at Mercy Radiology open and that she would be required to report to Transition Services if she wanted to remain an employee with Defendant.

81.     After Plaintiff was placed in Transition Services, she was not permitted to return to work until she was terminated on June 1, 2017.

## DISCRIMINATION AND RETALIATION

82.     Defendant's refusal to engage in the interactive process, failure to accommodate, and continued mistreatment of Plaintiff ended Plaintiff's employment.

83.     Plaintiff's three EEOC charges provided Defendant with the opportunity to address the discrimination and retaliation and to revise its policies and practices to make them compliant with the law, but no corrective action was taken.   Instead, Defendant's discriminatory and retaliatory actions against Plaintiff increased.

*Race and Sex Discrimination*

84.     In 2008–2009, Plaintiff requested and received an accommodation to sit after complications during her pregnancy.   Plaintiff was able to perform all of her job responsibilities each day up to and including the day she went into labor.

85.     Plaintiff's supervisor at the time had no issue with her requested accommodation to be permitted to sit while performing her duties at Mercy Radiology.

86.     When Plaintiff requested a leave of absence in 2015, it was Mr. Cudd, who replaced the previous supervisor, who started mocking Plaintiff's 2015 accommodation by calling it her "little magic."

14

87. Mr. Cudd is a white male.

88. Mr. Cudd did not demonstrate this same type of hostility towards another white female employee who had requested, and was granted, a similar accommodation due to a back injury. He also treated a white male employee more favorably than Plaintiff.

89. For three years, ending in May 2017, another white nurse at Mercy Radiology had requested and received an accommodation to allow her to sit during all procedures. Upon information and belief, Defendant and Mr. Cudd permitted this accommodation, did not impose any restrictions, and did not require her to take a medical leave of absence until she was 100%.

90. Upon information and belief, Defendant did not claim any undue hardship by allowing this nurse to spend most of her shift sitting.

91. At the same time that Defendant was demanding Plaintiff, an African-American female, be back to 100% before allowing her to return to Mercy Radiology, Defendant was allowing a white nurse to sit for periods far in excess of what Plaintiff requested and Defendant denied.

***Disability Discrimination***

92. Defendant was aware, since Plaintiff's First EEOC Charge, that Plaintiff was asserting discrimination based on her race, sex, and disability as well as retaliation but continued to maintain and dispute that she is disabled within the meaning of the ADAAA.

93. Defendant, however, repeatedly denied Plaintiff's requests to return to Mercy Radiology until she was 100% or until she could work without accommodations. Defendant obviously regarded Plaintiff as disabled and used that as a basis for refusing to allow her to return to work.

15

94. Despite notice, Defendant did not take any steps to correct Mr. Cudd's hostility towards Plaintiff. Instead, Defendant also treated Plaintiff negatively by refusing to engage in the interactive process in good faith when Plaintiff requested reasonable accommodations.

95. Initially, Defendant placed Plaintiff on temporary assignment when her doctor indicated Plaintiff would require sit down work only. However, Defendant could have accommodated Plaintiff's request and allowed her to continue working at Mercy Radiology because another white nurse was permitted to sit for each procedure for approximately three years. Defendant also could have placed her back to work in Teen Health since they needed her there and she was good at it.

96. It was a non-issue to Defendant for the other white nurse to sit down during her shifts. Her white coworker did not have to ask to sit down. If she needed to sit, she could easily just sit down, and did so most of her shifts.

97. However, Defendant made it an issue for Plaintiff because Defendant chose to discriminate, fail to accommodate, and retaliate against her.

98. Plaintiff's requests for accommodations were reasonable based on the accommodations provided to other white male and female nurses in Radiology and how the department operated.

99. Plaintiff continued to update Defendant with her improving condition throughout 2016, but Defendant continued to maintain that Plaintiff could not return to Mercy Radiology until she was at 100%. Upon information and belief, by requesting Plaintiff to be at 100%, Defendant was refusing to allow her to return to work until she was no longer disabled and no longer required accommodation.

16

100. The condition that Plaintiff recover 100% was an excuse by Defendant to prevent her from returning to Mercy Radiology although she was able to meet the job requirements of a CRN without reaching a full 100% recovery.

101. Defendant never offered to transfer Plaintiff to another position, even though she was willing and qualified for many available positions, including the TEEN Health Connection where she was placed temporarily and where she had worked successfully.

102. Defendant's ultimatum that Plaintiff go on unpaid leave or compete for and find another job within ninety (90) days was insufficient to qualify as engaging in the interactive process as Defendant would not consider any alternatives, and only served as a means for them to discriminate, retaliate, and terminate Plaintiff and, upon information and belief, other employees who requested reasonable accommodations for disabilities. Defendant was trying to get Plaintiff to quit.

***Retaliation***

*Failure to Provide Counselor*

103. As part of Transition Services policy, Plaintiff was supposed to be assigned a counselor to assist her in finding a new position. Defendant failed to provide Plaintiff with the name of the counselor for two weeks.

*Retaliatory Final Counseling*

104. On January 13, 2017, Defendant ignored its progressive discipline policy and issued Plaintiff a final counseling for "Unsatisfactory Performance." A final counseling is the last step in the corrective action process before termination. The individuals present included Mr. Cudd, Philip Schreibman, and Megan Johnston, who all had knowledge of Plaintiff's request for accommodation and protected activities, and, upon information and belief, her prior wage and hour complaint. They wanted to get rid of Plaintiff and went to great lengths to do it.

17

105. The final counseling specifically stated that Plaintiff had not completed her Annual Compliance Education ("ACE") training modules "as of October 14, 2016" even though they knew full well that she completed them on October 15, 2016, and they did not bother to issue the counseling until January 13, 2017. The final counseling was not given to Plaintiff until almost three months after she already completed the training modules and renewed her BLS, allowing Defendant ample time to recognize Plaintiff's completion.

106. Defendant's blatant refusal to acknowledge that she already completed the ACE modules and renewed her BLS in October 2016 was disingenuous, discriminatory, and retaliatory.

107. Although Plaintiff should not have been disciplined for her BLS lapsing while she was on medical leave, Defendant failed to follow its progressive discipline policy of first giving a verbal counseling, then written counseling, and then a final counseling—they went straight to the final counseling despite the fact Plaintiff had completed her ACE module training and renewed her BLS certification several months before the final counseling.

108. Philip Schreibman, Senior Human Resources Consultant, told her that the period to complete the ACE modules and BLS certification had been extended for other employees on medical leave.

109. However, Defendant never informed Plaintiff that the deadline to complete these items could be extended while she was on medical leave. She was not so notified until January 13, 2017, after they already expired.

110. Although she should not have been required to complete them while on medical leave, Plaintiff completed the ACE training modules on October 15, 2016 while she was on leave and renewed her BLS Certification in October 2016.

111.     It was unnecessary for Defendant to issue the final counseling to Plaintiff because both items were completed in October 2016 three months prior to the January 13, 2017 counseling, and they could have simply given her an extension due to her being on medical leave.

112.     The Director suggested a resolution process, which Plaintiff followed by submitting a written Resolution Procedure Form on or about January 20, 2017. Plaintiff submitted the form and indicated that she believed the counseling was further retaliation for her requests for reasonable accommodation and filing EEOC Charges, and that the true purpose was to prevent her from obtaining another job with Defendant, to try to make her quit, or set her up to get fired.

113.     However, the final counseling was upheld on or about February 9, 2017. Upon information and belief, the Director also knew about her prior wage and hour complaint.

114.     Upon information and belief, the written counseling was issued solely to retaliate against Plaintiff for her requested accommodations and protected EEO activity.

115.     The final counseling was also issued only a month after Plaintiff filed her Second EEOC Charge. Upon information and belief, Defendant received notice of the Second EEOC Charge shortly before giving the final counseling to Plaintiff.

116.     Upon information and belief, this final counseling appeared in Plaintiff's personnel file and has been available to potential hiring managers within Defendant. Plaintiff did not get any job interviews after the counseling was issued.

117.     Upon information and belief, Defendant added the final counseling to Plaintiff's file and on the system to either: 1) make her ineligible for a new position, 2) dissuade any potential managers from hiring her, or 3) to try and get rid of her.

19

118.     Upon information and belief, Plaintiff was unable to obtain any employment internally with Defendant prior to termination as a result of her disability, her protected EEO activities, and the retaliatory final counseling in her personnel file.

*Failure to Hire/Failure to Reassign Plaintiff to Vacant Positions*

119.     Plaintiff applied for 29 positions for which she was qualified. She had 4 interviews but was not selected despite her qualifications. Upon information and belief, these positions were filled with candidates outside of Plaintiff's protected classes. Plaintiff did not get interviews after the final counseling was issued to her.

120.     Defendant failed to reassign Plaintiff because of her race, sex, disabilities, because Defendant regarded her as disabled, and in retaliation for her EEO activities.

121.     Reassigning Plaintiff to a vacant position for which she was qualified would not have been an undue hardship for Defendant.

*Failure to Notify Plaintiff of Termination*

122.     On June 28, 2017, Plaintiff was not able to log in to the employee portal since her user name and password were not recognized. She called tech support for assistance and was told that she could not login because she was no longer an employee.

123.     June 28, 2017 was the first time Plaintiff was informed of her termination.

124.     Upon information and belief, Defendant terminated Plaintiff on May 20, 2017 but did not contact or provide notice to Plaintiff. Defendant later claimed it mailed a termination letter to Plaintiff, but the letter was returned undeliverable. Plaintiff did not receive the letter or any notice of her termination because Defendant mailed it to the wrong address. Upon information and belief, Defendant did not make any other attempt to notify Plaintiff or her counsel of her termination. Upon further information and belief, Defendant had Plaintiff's correct address on file

and could have contacted her by phone but chose not to do so. Defendant also knew Plaintiff was represented by counsel but failed to notify her counsel of her termination.

125.    The first correspondence to Plaintiff related to her termination was the letter informing her of the availability of COBRA insurance, which she received July 1, 2017.

126.    Upon information and belief, Defendant claimed it terminated Plaintiff pursuant to CHS HR 4.10-Policy, as set forth below:

> A team member may be unable to return to their regular job at the end of the 90 day temporary transitional assignment benefit. In this instance, the team member's situation will be reviewed…Approved team members will be assisted by a Transition Services coordinator in finding a position… If a position is not found within 90 calendar days after working with the Transition Services coordinator and whether or not a temporary assignment is found, unfortunately the employment relationship with CHS will end.

CHS HR 4.10-Policy.

*Punitive Damages and Defendant's Intentional Conduct*

127.    Plaintiff and the EEOC gave Defendant multiple opportunities to stop, change, and correct its discriminatory and retaliatory treatment of Plaintiff as well as its discriminatory policies or discriminatory or retaliatory application of those policies, but Defendant adamantly and deliberately refused to comply with state and federal laws.

128.    Defendant had actual notice that Plaintiff's doctor recommended a reduced request for accommodation based on her improvements as her recovery progressed, yet they still refused to accommodate her even though they knew she could perform the essential functions of her job in Radiology with reasonable accommodation as supported by the documentation provided by her doctor.

129.    Defendant rejected Plaintiff's updated and reduced request for reasonable accommodations on the basis that she could not return to Radiology unless she could perform the work without <u>any</u> accommodations whatsoever. Defendant is aware of, deliberately indifferent to,

21

or recklessly disregarded the fact that this does not fulfill its obligation to engage in the interactive process and violates the ADAAA.

130. Defendant conditioned Plaintiff's employment on her being free from any disability, although her requested accommodations did not result in any undue hardship to Defendant.

131. Defendant decided that it would not accommodate Plaintiff's requests, no matter how minimal and reasonable, even as her restrictions and right foot/ankle strength improved over time:

| Date | Requested Accommodation | CHS Response |
|---|---|---|
| April 2006 – January 2015 | None | |
| January 2015 | Requested modified work schedule due to poor sleep and concentration issues | Supervisor Mike Cudd refused the accommodation, changed her schedule, and treated her more harshly than her non-disabled coworkers |
| March 2016 | Leave of absence for reconstructive surgery on right foot/ankle and recovery | Leave of absence until May 2016 |
| 5/18/2016 | Return to work form filed which included the doctor's restrictions Sit down work only, limit standing and walking | Cannot return to Radiology until "100%" Temporary assignment to Pediatric Resource Center |
| 6/16/2016 | No standing or walking for more thirty minutes | Cannot return to Radiology until "100%" Continued temporary assignment to Pediatric Resource Center, provide update with doctor's note within two weeks |
| 6/29/2016 | 5 day leave of absence to address difficulty focusing at work, inability to sleep due to assignment in Pediatric Resource Center Requested move from Pediatric Resource Center | Leave granted Moved from Pediatric Resource Center to Teen Health Connection to begin 07/25/2016, unpaid until that date |
| 7/28/2016 | Use of knee scooter, flexibility to attend physical therapy sessions, and rest periods of 2-4 minutes as need | Denied |
| 8/18/2016 | Use of knee scooter, flexibility to attend physical therapy sessions, and rest periods of 2-4 minutes as need | Denied |

22

| 8/31/2016 | Use of knee scooter, flexibility to attend physical therapy sessions, and rest periods of 2-4 minutes as need | Temporary assignment expired. Still needed in Teen Health but not allowed to stay. Options: (a) return to Radiology with <u>no</u> accommodations or (b) apply for open positions in other departments. |
|---|---|---|
| 9/15/2016 | Intermittent sitting for 15 minutes an hour as needed for swelling, throbbing in foot region. Infrequent use of a knee scooter for mobility. Avoid excessive stair/ladder climbing. No specific lifting restriction. Able to lift 35 pounds as required of a clinical nurse.<br><br>Alternative: reassignment | Denied. Undue hardship claimed but not explained.<br><br>Options presented: (a) unpaid leave of absence until 10/31/2016 or (b) accept reassignment to Transition Services for 90 days. |
| 10/21/2016 | Occasional 15-minute periods of sitting as necessary for increased pain/swelling. No other restrictions.<br><br>Alternative: reassignment | Denied. Undue hardship claimed but not explained.<br><br>Options presented: (a) unpaid leave of absence until 10/31/2016 or (b) accept reassignment to Transition Services for 90 days. |
| 11/07/2016 | Brief periods of sitting as necessitated by pain/swelling; 15-minute max in any hour. Avoid excessive lifting/stair climbing.<br><br>Alternative: reassignment | Denied. Undue hardship claimed but not explained.<br><br>Options presented: (a) unpaid leave of absence until 10/31/2016 or (b) accept reassignment to Transition Services for 90 days. |
| 11/15/2016 | Brief periods of sitting as necessitated by pain/swelling; 15-minute max in any hour. Avoid excessive lifting/stair climbing.<br><br>Alternative: reassignment | Clinical Nurse I position in Radiology will not be held open; 90 days to find another job within CHS |

132.    Plaintiff and her doctor clarified all of this to Defendant in writing and made it very clear to Defendant that she was not asking for any lifting restrictions since she could fulfill the known job requirement of lifting 35 pounds as well as the other requirements of her job.

133.    Clinical Nurses in the Radiology department do not lift patients. Any required lifting is completed by an automatic lift machine.

134.    Plaintiff's requests were reasonable and necessary for her, and so minor that Defendant cannot plausibly claim it was unable to accommodate without undue hardship.

23

135.    Defendant adamantly and even rudely refused to accommodate Plaintiff numerous times, and failed to engage in the interactive process despite Plaintiff's repeated efforts to engage in that process.

136.    Defendant belittled and disrespected Plaintiff to embarrass and humiliate her, and to get her to quit.

137.    Defendant discriminated against Plaintiff because of her disability, regarded her as disabled, but also retaliated against her because she made prior requests for disability accommodations, and also because she filed charges with the EEOC saying as much.

138.    Upon information and belief, Defendant also knew that in the past, Plaintiff required Defendant to pay her earned but unpaid wages in a wage and hour dispute.

139.    Defendant not only refused to let Plaintiff work in Radiology because she was disabled and not "100%," but also simultaneously denied and reserved the right to challenge that Plaintiff was disabled within the meaning of the ADAAA – Defendant cannot have it both ways.

140.    Defendant has actual notice that Plaintiff is a skilled clinician who cares deeply about her practice and her patients. She was an employee for Defendant in the Radiology Department for more than ten years. She simply wanted to return to her work in the Radiology Department with reasonable accommodation or be allowed to remain in Teen Health, instead of being forced to take unpaid leave, made to apply and compete for other positions, and ultimately terminated.

141.    Defendant was obligated to either: 1) allow her to return to Radiology, 2) allow her to continue working in Teen Health, or 3) reassign her to a vacant position for which she was qualified with or without reasonable accommodation. None of these requests posed an undue hardship. Defendant failed to accommodate Plaintiff, failed to engage in the interactive process,

24

forced her into extended, unpaid leave, and forced her to find another job or be terminated, then ultimately terminated her after failing to reassign her or hire her to vacant positions for which she was qualified with or without reasonable accommodation.

**COUNT I**
**(Title VII, 42 U.S.C. § 2000e *et seq.* – Discrimination and Retaliation**
**Based on Race and Sex)**

142.    The allegations of the previous paragraphs are realleged and incorporated herein by reference.

143.    Defendant regularly employed more than fifteen (15) employees at all relevant times.

144.    Plaintiff is an African American female and is thus a member of a protected class based on her race and sex.

145.    Defendant, through its agents, employees, and supervisors, engaged in unlawful discrimination against Plaintiff, and failed to accommodate her disabilities, based on her race and sex.

146.    At all relevant times, Plaintiff's supervisor was a white male.

147.    Once Mr. Cudd became Plaintiff's supervisor, he started questioning Plaintiff's requested accommodations, placed Plaintiff under increased scrutiny, changed her schedule, and issued a retaliatory final counseling.

148.    Mr. Cudd approved the similarly situated white nurse's accommodations but denied Plaintiff's accommodations. Mr. Cudd also treated a similarly situated white male coworker more favorably than Plaintiff.

25

149. Defendant, through Mr. Cudd, repeatedly denied Plaintiff's requested accommodations for six months. Upon information and belief, the white nurse was permitted to sit for periods of time greater than fifteen minutes per hour, often for the duration of any procedure.

150. At the same time, Plaintiff's requested accommodations were denied. The last accommodation Plaintiff requested was to be able to sit for no more than fifteen minutes on an intermittent basis.

151. After Plaintiff engaged in protected activity by filing her EEOC charges and requesting accommodations, Defendant engaged in a series of retaliatory actions.

152. Defendant issued Plaintiff a final counseling a month after Plaintiff filed the Second EEOC Charge. The final counseling cited Plaintiff's failure to complete training, even though Plaintiff had completed the training three months earlier.

153. Defendant terminated Plaintiff without providing her a termination notice.

154. Defendant had knowledge of and ratified the acts of unlawful race and sex discrimination and continuing retaliation against Plaintiff and refusal to accommodate her disabilities based on her race and sex, and it failed to take corrective action to remedy the discrimination and continuing retaliation inflicted on Plaintiff.

155. There is compelling evidence of willful and intentional discrimination.

156. A causal connection exists between Plaintiff's protected activities and the adverse actions taken against her.

157. As a result of Plaintiff's protected activities, race, and sex, Plaintiff was prevented from returning to her position with Mercy Radiology or from being transferred to an available position for which she was qualified.

26

158. To the extent Defendant purports to have had legitimate, non-discriminatory reasons for taking adverse actions against Plaintiff, such reasons are pretexts for the true reasons, which are her race, sex, and legally protected activities, as described herein.

159. Defendant's conduct, as described above, was without justification or excuse, is reprehensible, and occurred despite Plaintiff's efforts to prevent, halt, and reverse the discrimination and retaliation. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is now and will continue to be unlawfully deprived of income in the form of wages, compensation, and other monetary and non-monetary benefits due to her, in amounts to be proven at trial.

160. As a result, Plaintiff is entitled to recover from Defendant damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, punitive, and compensatory damages; injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; prejudgment interest; and the costs of this action.

### COUNT II
#### (ADAAA, 42 U.S.C. §§ 12112 *et seq.* – Discrimination and Retaliation Based on Disability)

161. The allegations of the previous paragraphs are realleged and incorporated herein by reference.

162. Plaintiff had major reconstructive surgery on her foot and ankle, with some complications occurring during the recovery period resulting in chronic pain syndrome and swelling. Plaintiff's condition, as described above, qualifies as a disability within the meaning of the ADAAA.

27

163.    Plaintiff's disability substantially limited her major life activities related to walking, standing, and climbing and required Plaintiff to be able to sit if substantial pain or swelling occurred.

164.    Plaintiff also had depression, anxiety, and ADHD, disabilities which substantially limited her major life activities including but not limited to sleeping, concentrating, focusing, organizing, interacting with others, and fatigue.

165.    Defendant was aware of Plaintiff's disability and her requests for accommodations which were updated regularly by Plaintiff as her condition improved.

166.    Plaintiff requested to be allowed to return to Mercy Radiology; she received her doctor's recommendation that she would be able to perform the essential functions of her job based on his experience and knowledge of radiology departments; and Plaintiff provided Defendant with her doctor's note explaining her requested accommodations.

167.    Alternatively, Plaintiff asked that if Defendant would not allow her to return to Mercy Radiology, that Defendant transfer her to a position for which she was qualified or otherwise allow her to continue her employment with Defendant.

168.    Defendant also improperly regarded Plaintiff as disabled and unable to perform her job and refused to allow her to return to work until she was "100%" when she was able and willing to work.

169.    Plaintiff is a qualified individual able to perform the essential duties of a Clinical Nurse I, she was capable of completing the assignments at Mercy Radiology with the requested accommodations, as demonstrated during her pregnancy in 2008–2009.

170.    Plaintiff's disability and her protected activity of submitting multiple charges to the EEOC were motivating factors in Defendant's termination of Plaintiff.

28

171. Defendant's failure to accommodate Plaintiff's disability and failure to engage in the interactive process in good faith was in retaliation for Plaintiff engaging in protected activity.

172. Defendant either intended to cause, or was recklessly indifferent to the likelihood that its conduct would cause, severe emotional distress to Plaintiff.

173. Defendant's conduct did in fact cause severe emotional distress to Plaintiff, including severe depression and anxiety.

174. Defendant's conduct, as described above, was outrageous and aggravated, and included actual malice, oppression, insult, rudeness, indignity, and a reckless and wanton disregard of Plaintiff's rights and interests under the ADAAA. As a result, Plaintiff is entitled to an award of punitive damages.

175. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is now and will continue to be unlawfully deprived of income in the form of wages, compensation, monetary and non-monetary benefits due to her, and medical and other expenses.

176. As a result, Plaintiff is entitled to recover from Defendant all damages in excess of twenty-five thousand dollars ($25,000) in an amount to be proven at trial, including consequential, general, special, punitive, and compensatory damages; injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; pre- and post- judgment interest; reasonable attorneys' fees; and the costs of this action.

## COUNT III
**(Wrongful Discharge in Violation of Public Policy Based on Gender, Race, and Disability – North Carolina Equal Employment Practices Act N.C. Gen Stat. § 143-422.1, *et seq.*)**

177. The allegations of the previous paragraphs are realleged and incorporated herein by reference.

178. Plaintiff was an employee-at-will of Defendant.

29

179.     The public policy of the State of North Carolina, as set forth in N.C. Gen. Stat. § 143-422.2(a), North Carolina's Equal Employment Practices Act ("NCEEPA"), prohibits employers from discriminating against employees on the bases of their race, gender, or disability.

180.     Defendant violated the public policy of North Carolina as set forth in N.C. Gen. Stat. 143-422.1 *et seq.* by terminating Plaintiff because of her race, gender, and disability, and because of her complaints to the EEOC of the discrimination and retaliation based on her race, gender, and disability.

181.     Plaintiff's supervisor, Mr. Cudd, was supported in his race, gender, and disability discrimination by Defendant's pattern and practice of denying employees the opportunity to engage in the interactive process when requesting reasonable accommodations.

182.     After Plaintiff complained to the EEOC regarding the discrimination, Defendant retaliated against Plaintiff up to and including termination.

183.     Defendant's conduct was outrageous and aggravated, and included actual malice, oppression, insult, rudeness, indignity, willful, wanton, or a reckless disregard for Plaintiff's rights and interests. As a result, Plaintiff is entitled to an award of punitive damages.

184.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is now and will continue to be unlawfully deprived of income in the form of wages, compensation, monetary and non-monetary benefits due to her, and medical and other expenses.

185.     As a result, Plaintiff is entitled to recover from Defendant all damages in excess of twenty-five thousand dollars ($25,000) in an amount to be proven at trial, including consequential, general, special, punitive, and compensatory damages; injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; pre- and post- judgment interest; reasonable attorneys' fees; and the costs of this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays the Court as follows:

1.      Pursuant to Count One (*Violations of Title VII*), that Plaintiff have and recover from Defendant all damages in excess of $25,000.00 in an amount to be proven at trial, including punitive, consequential, general, special, punitive, compensatory, injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; pre- and post-judgment interest; reasonable attorneys' fees; and the costs of this action;

2.      Pursuant to Count Two (*Violations of ADAAA*), that Plaintiff have and recover from Defendant all damages in excess of $25,000.00 in an amount to be proven at trial, including punitive, consequential, general, punitive, special, compensatory, injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; pre- and post-judgment interest; reasonable attorneys' fees; and the costs of this action;

3.      Pursuant to Count Three (*Wrongful Discharge in Violation of Public Policy – NCEEPA*), that Plaintiff have and recover from Defendant all damages in excess of $25,000.00 in an amount to be proven at trial, including punitive, general, special, compensatory, injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; pre- and post-judgment interest; reasonable attorneys' fees; and the costs of this action;

4.      That the Court order injunctive relief against Defendant to cease the pattern and practice of discrimination and retaliation against employees and cause Defendant to cease such wrongful practices as monetary relief alone is insufficient to provide complete relief;

5.      That Plaintiff have and recover all costs incurred in this action, including attorneys' fees;

6.      The cost of this action be taxed against the Defendants;

31

7.  That this matter proceed to trial before a jury; and

8.  That the Court may grant such other and further relief as it deems just and proper.

Respectfully submitted, this the 28th day of January, 2019.

MALONEY LAW & ASSOCIATES, PLLC

Margaret Behringer Maloney, N.C. Bar 13253
Jennifer Diane Spyker, N.C. Bar 46048
1824 E. Seventh Street
Charlotte, NC 28201
mmaloney@maloneylegal.com
jspyker@maloneylegal.com
Telephone: 704-632-1622
Facsimile: 704-632-1623
*Attorneys for Plaintiff*

32